IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTA ALANA DECKER,　　　　)
　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　)　　No. 13 C 1732
v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)　　Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN,　　　　　　)
Acting Commissioner of Social Security, )
　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　)

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Christa Decker moves for reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") (doc. # 14: Claimant's Motion for Summary Judgment). The Commissioner has filed a response seeking affirmance of the decision (doc. # 26: Defendant's Response to Motion). Plaintiff has filed her reply (doc. # 22: Reply), and so now the matter is fully briefed. For the following reasons, we grant Ms. Decker's motion for remand on a narrow issue and thus deny the Commissioner's request for affirmance.

## I.

Ms. Decker first applied for DIB and SSI[2] in October 2005, alleging an onset date of June 1, 2000 (R.101). After her claims were denied initially and upon reconsideration (R. 176, 190), she participated in a hearing before Administrative Law Judge ("ALJ") Joseph Donovan, Sr. on

---

[1] On June 18, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. #13).

[2] Ms. Decker's original application for Supplemental Security Benefits ("SSI") was denied because she had too many assets (R. 101).

August 14, 2007 and June 11, 2008 (R. 97-147). On October 11, 2008, the ALJ issued a decision finding that Ms. Decker was not disabled; Ms. Decker requested a review of this decision and the Appeals Council granted her request, finding three open issues that required remand to an ALJ for further consideration:

- Although the first ALJ found that Ms. Decker had moderate limitations in maintaining concentration, persistence and pace, he did not find that she had a severe mental impairment or include any non-exertional limitations in his RFC. Therefore, the Appeals Council directed that on remand, an ALJ "further evaluate Ms. Decker's mental impairment in accordance with the special technique described in the regulations and provide specific findings for each of the functional areas described in 20 CFR 404.1520a and 416.920a(c)";

- The first ALJ's decision recognized Ms. Decker's complaints of back and neck pain, but found that fibromyalgia was her only severe impairment and did not indicate the severity of her cervical and lumbar radiculopathy as diagnosed in the record. Therefore, the Appeals Council directed that on remand, an ALJ "further evaluate Ms. Decker's subjective complaints of pain and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms in 20 CFR 404.1529 and 416.929, particularly with respect to her cervical and lumbar radiculopathy[3] and obtain supplemental evidence from a medical expert if necessary"; and

- While the first ALJ gave considerable weight to the fact that a medical expert concurred with the decision's RFC, in fact the named expert did not actually offer an opinion about Ms. Decker's RFC. Therefore, the Appeals Council directed that on remand, an ALJ "give further consideration to Ms. Decker's maximum RFC with specific references to evidence in the record" (R. 169-170).

Ms. Decker, who was represented by counsel, testified at a hearing before a new ALJ on May 9, 2011; her husband and a Vocational Expert ("VE") testified as well (R. 54-96). On June 3, 2011, the ALJ denied Ms. Decker's claim for benefits (R. 27-29), and the Appeals Council denied her request for review (R. 1-3), making the second ALJ's ruling the final decision of the

---

[3] Cervical and lumbar radiculopathy refer to any disease or injury that affects the spinal nerve roots, causing pain, numbness, tenderness or other nerve-related symptoms. http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3192889/ (visited on October 31, 2014).

Commissioner. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). It is this decision we review in this opinion.

## II.

We first summarize the administrative record. Part A reviews Ms. Decker's medical history, Part B reviews the hearing testimony and Part C summarizes the ALJ's opinion.

## A.

Ms. Decker was born on June 12, 1973 and has a history of treatment for various injuries and chronic pain dating back to her childhood. She has suffered face and jaw pain and trouble opening her jaw since dropping a barbell on her face while bench-pressing in high school (R. 75). Ms. Decker was hospitalized in 1994 for a serious auto accident that resulted in a collapsed lung, concussion and neck pain (R. 79, 490-514).

Ms. Decker began to experience pain in her lower back with the birth of her third child in 2000 (R. 78-79). She saw a doctor for back pain in 2001 and reported feeling better after taking pain medication (R. 672). An MRI of her back in 2003 revealed mild scoliosis and mild degenerative changes but no other issues (R. 564). In September 2004, rheumatologist Ahmed Saba, M.D. diagnosed Ms. Decker with fibromyalgia[4] and suggested a course of physical therapy (R. 571). Ms. Decker had a bone scan in September 2004 that showed a normal lumbar spine, pelvis, vertebrae and joints (R. 479-486). An electromyography ("EMG"), or nerve conduction study, she underwent in April 2005 revealed no nerve abnormalities or neuromotor issues (R. 471).

---

[4] Fibromyalgia is a disorder that is "characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243 (visited on October 3, 2014).

Also in April 2005, Ms. Decker began treatment at the Joliet Pain Care Center (R. 661). Ms. Decker saw various medical doctors, chiropractors and physical therapists more than 90 times between April 2005 and April 2007. In May 2005, neurologist Wayne Kelly, M.D. evaluated Ms. Decker for complaints of chronic lower back pain, neck pain, TMJ pain and difficulty opening her jaw,[5] and numbness of her arm and leg (R. 520-22). Dr. Kelly suspected that Ms. Decker had carpal and tarsal tunnel syndrome,[6] fibromyalgia which was possibly caused by sleep deprivation and sleep disorder/sleep apnea problems (*Id*). Dr. Kelly prescribed a pain patch for Ms. Decker and performed nerve block injections to alleviate her carpal and tarsal tunnel pain (R. 523, 515-16). Also in May 2005, Antoine Chami, MD, of the Joliet Pain Care Center evaluated Ms. Decker as having more than the 11 out of 18 points of tenderness needed for a diagnosis of fibromyalgia (R. 518).

Ms. Decker underwent physical therapy for her back, neck, hand, and jaw issues twice-weekly throughout 2005 and 2006 (R. 538-53, 622-32, 705-713). She showed some improvement from the physical therapy, but continued to report pain in various parts of her body during this time (*Id.*). In September 2005, Ms. Decker underwent a sleep study and Dr. Kelly diagnosed her with sleep apnea (R. 529-30). Dr. Kelly prescribed a sleeping pill and a CPAP[7] machine, which Ms. Decker wore at night while she slept (*Id.*, R. 603-604). After some initial

---

[5] TMJ refers to the temporomandibular joint, which acts as a sliding hinge connecting the jaw bone to the skull and which allows the jaw to be opened and closed. http://www.mayoclinic.org/diseases-conditions/tmj/basics/definition/con-20043566 (visited on October 3, 2014). Because of her TMJ issues, Ms. Decker was unable to open her jaw more than 2 ½-3 centimeters (R. 517-18).

[6] Carpal and tarsal tunnel syndromes are conditions characterized by numbness, tingling and pain in the hands (carpal) and feet (tarsal) caused by pinched nerves in those areas. http://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/basics/definition/con-20030332, http://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/peripheral_nerve_surgery/conditions/tarsal-tunnel-syndrome.html, (Visited on November 7, 2014).

[7] CPAP stands for "continuous positive airway pressure" and refers to a treatment with a mask that uses mild air pressure to keep the airways open, in this case, during sleep. http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/ (Visited on November 7, 2014).

difficulty adjusting to the CPAP, Ms. Decker showed improvement in her sleep apnea issues (R. 619-20).

In February 2006 Ms. Decker had another EMG which Dr. Kelly judged abnormal, showing chronic, severe, bilateral C5-6 cervical radiculopathy (degeneration in the neck vertebrae causing neck and radiating arm pain) and carpal tunnel syndrome (R. 700-703). Dr. Kelly performed a second round of epidural injections to alleviate Ms. Decker's arm, hand and neck pain in March 2006; the injections were only partially successful and Dr. Kelly suggested that Ms. Decker undergo surgery for her carpal tunnel syndrome (R. 704, 727). He also suspected that Ms. Decker had a rotator cuff injury separate from her cervical problems (R. 727).

Ms. Decker underwent carpal tunnel surgical releases on her right and left hands in May and June 2006 (R. 885-886). She showed almost 100 percent resolution of her pain on the right side and significant improvement on her left, with only some numbness remaining (*Id.*, R. 889). In late 2006 Ms. Decker had surgery on her jaw, which resulted in marked improvement in her TMJ issues and alleviated her headaches (R. 893-94).

After her surgeries alleviated the majority of Ms. Decker's carpal tunnel and TMJ pain, she also began showing significant reduction in her level of pain due to her cervical and lumbar radiculopathy (R. 894). The use of prescription pain medications and pain patches controlled her symptoms well and in January, February and April 2007 she reported continued overall improvement with her pain and sleep problems as well as satisfaction with her pain medication (R. 895-96, 924).

Ms. Decker visited the Institute for Personal Development several times between July and September 2006 to discuss her mental health. She met with physician assistant Lucinda Torgerson and Laura Jansons, Psy.D. (R. 935-962). Ms. Torgerson assessed Ms. Decker for

ADHD (but the record does not contain the results of the test) and also spoke with Ms. Decker about her medications (particularly Valium), anxiety and depression over her grandfather's illness and subsequent death, and her chronic pain (*Id.*). The record does not contain evidence that Ms. Decker had any other mental health treatment.

In June 2007, Ms. Decker began seeing Faris Abusharif, M.D. at the Pain Treatment Center of Illinois (R. 965-66). He assessed Ms. Decker as having full range of motion in her upper and lower spine and extremities, normal strength, good muscle tone and a normal gait (*Id.*) He also noted that her previous diagnosis of fibromyalgia was unconfirmed at the time he examined her and that much of her cervical pain was likely related to her rotator cuff injury and not a cervical spine issue (R. 964). Dr. Abusharif gave Ms. Decker several epidural injections in 2007 for some lower back pain (*Id.*). In December 2007 Dr. Abusharif discontinued one of Ms. Decker's pain patches and reduced the dosage of another pain medication (Norco) because she was showing consistent relief (R. 1020).

In May 2008, Ms. Decker began seeing neurologist Thomas Zabiega, M.D. (R. 925-26). Dr. Zabiega assessed Ms. Decker as having muscle strength of 5/5 and a normal gait (R. 1030-31). He continued Ms. Decker on the lower dose of pain medication prescribed by Dr. Abusharif because Ms. Decker was showing continued stability and also because of concerns about her becoming addicted to stronger medications (*Id.*). Ms. Decker continued to experience good pain control with her medication regimen throughout 2009 and 2010. When Ms. Decker visited Morris Hospital ER in June 2010 for acute bronchitis, she demonstrated a normal range of motion in her extremities and no areas of tenderness (R. 1052). In October 2010, when the medical record ends with notes from a follow up appointment at the Joliet Headache and Neuro

Center, Ms. Decker presented no new problems with pain or physical limitations and was doing well on her medication regime (R. 1060-63).

Ms. Decker also underwent a number of consultative physical and mental health examinations during the course of her applications for DIB. In January 2006, Ms. Decker was scheduled to undergo a consultative exam, but refused to attend (R. 694).[8] Instead of conducting an in-person exam, medical consultant Henry Bernet completed an RFC assessment based on a review of Ms. Decker's medical records that found Ms. Decker to have no limitations at all (R. 684-691). In April 2006, Ms. Decker had a psychological evaluation by Mark Langgut, PhD (R. 812-15). Dr. Langutt noted that Ms. Decker was cooperative but had trouble focusing during the exam and was preoccupied and "emotionally revealing" (*Id.*). His report stated the he suspected she had dysthymia, or mild, chronic depression, and that chronic pain made it difficult for Ms. Decker to sit still (*Id.*). In April 2006, chiropractor Dan Counihan completed an RFC questionnaire for Ms. Decker that opined she could sit, stand or walk for 5 hours per day, work for 4 hours per day and had limitations in her ability to grasp or lift due to carpal tunnel syndrome and cervical disc herniation (R. 839-842).

In May 2006, Kurt Boyenga, PhD, completed a "Mental Residual Functional Capacity Assessment" based on his review of Dr. Langgut's exam (R. 818-34). Dr. Boyenga diagnosed Ms. Decker with dysthymia and rated her "Paragraph B" functional limitations as mild for activities of daily living, moderate for difficulties in maintaining social functioning, moderate for difficulties in maintaining concentration, persistence or pace and "none" for episodes of decompensation (R. 828). Dr. Boyenga found no evidence of "Paragraph C" criteria (R. 829).

---

[8] Ms. Decker was informed that the Commission would make a decision about her RFC based on the information in her file and without her needing to undergo an exam. Ms Decker agreed to this course of action regardless of the outcome (R. 694).

On October 22 and 23, 2007, Ms. Decker underwent back-to-back physical and psychological consultative examinations (R. 987-91, 1000-07). At her physical exam, Rheumatologist Scott Kale, M.D. noted that Ms. Decker presented herself "in agony," told him that she could not move at all because of pain, and "she appear[ed] to be unwilling to move any body parts" (R. 989-90). However, Dr. Kale further noted that when she thought she was not being observed, Ms. Decker seemed to be able "to move her cervical spine, shoulders, elbows, wrist and fingers in a normal plane" (*Id.*) Dr. Kale concluded that Ms. Decker had a "markedly exaggerated presentation of her painful condition with suggestion that her primary problems are psychiatric and not physical," and that she was likely "somaticizing [converting anxiety into physical symptoms] to a large degree" (*Id.*). He described her as suffering from chronic pain syndrome with depression (*Id.*). Dr. Kale completed an RFC report for Ms. Decker that barred her from almost all physical activity including sitting, standing or walking for more than an hour per day; the report also stated that she could never reach, push or pull with either hand and could occasionally handle, finger or feel (R. 992-97). In the report, Dr. Kale noted he was basing his decision on Ms. Decker's "subjective pain complaints" (*Id.*).

At Ms. Decker's mental status examination the following day, Michael Stempniak, Ph.D noted that she seemed distractible, sporadically added answers to previous questions, and was somewhat difficult to follow, but was able to give enough information for a reasonably good estimate of present functioning (R. 1000). Dr. Stempniak assessed Ms. Decker as having recurrent Major Depressive Disorder - mild, chronic Post Traumatic Stress Disorder, and Panic Disorder with Agoraphobia (R. 1003). He completed an "Ability to do Work-Related Activities – Mental" evaluation for Ms. Decker that stated she had no restrictions in understanding simple instructions and mild restrictions in carrying out simple instructions and the ability to make

simple, work-related decisions (R.1005). She was moderately restricted in her ability to understand and carry out complex instructions or make decisions on complex, work-related issues (*Id.*). Dr. Stempniak also assessed Ms. Decker as having moderate difficulties interacting with the public or co-workers and with being able to response appropriately to usual work situations, but said she was only mildly restricted in her ability to interact with supervisors (R. 1006). Ms. Decker did not undergo additional consultative examinations after October 2007.

**B.**

At the hearing before the second ALJ in May 2011, Ms. Decker was almost 38 years old. She testified that she was unable to work because "everything hurts" (R. 60) and that she spent her days drinking coffee, sitting in her chair and trying to read, occasionally doing laundry, taking her pills and sleeping (R. 63-64). She had not driven since 2008 because her medications make her dizzy (R. 67). Ms. Decker stated that she could lift five or six pounds, such as the gallon of milk she had lifted that morning, and sit or stand for about 30 minutes at a time (R. 68). She used a CPAP machine for sleep that helped with her apnea if she was "not fighting with it" (R. 69). Ms. Decker also testified that she saw her doctor about once every six months for medication refills and that she could not afford to see her doctor more often (R. 64-65).

Ms. Decker testified that her carpal tunnel surgery did not help relieve her hand pain and that her hands were still numb, but she did not have the money for additional nerve block injections (R. 70). She also stated that medications took the edge off the worst of the pain but did not relieve it completely (R. 71). With respect to her TMJ issues, Ms. Decker testified that the problems with her jaw had not been fixed, and she rated the pain as a "7" (R. 76). She testified that she had not talked on the phone very much since August 2007 when her best friend moved away and that it hurt too much to talk on the telephone in any event (R. 65). The ALJ questioned

her about an "activities of daily living" questionnaire her husband completed in March 2006 that stated Ms. Decker spoke on the phone for "4-5 hours per day" with a headset (R. 66). Ms. Decker explained that she could talk to her husband by phone while he was on his trucking route because she did not have to speak clearly or carry much of the conversation (*Id.*).

The ALJ questioned Ms. Decker about her past treatment for mental health issues. She testified that as part of her treatment at the Joliet Pain Clinic she saw a therapist[9] and was sent to a physician's assistant to assess her for ADHD but did not pursue treatment for mental health issues (R. 60-62). She has taken Valium and anti-depressants in the past but has never seen a psychiatrist and doesn't want to talk to a psychologist because they "creep [her] out" (*Id.*). Ms. Decker testified that she rarely goes out because she does not like being around people but that her husband makes her leave the house at least once per month, usually to go to the grocery store with him (R. 60, 64-65).

Ms. Decker's husband testified that it had been "years" since his wife had driven a car and that she rarely used a computer (R. 84). He said that Ms. Decker mostly stayed at home because it was easier and that when she did go out, she usually needed to come home after an hour and a half (*Id.*). Mr. Decker testified that his wife had seen a lot of doctors who all said that they could only treat her condition, not fix it (R. 88).

At the hearing, the ALJ asked the VE what jobs would be available for an individual of Ms. Decker's age, education and experience who could perform light work that did not involve more than occasional climbing, balancing, stooping, kneeling, or crawling and that did not involve work around hazards or dangerous moving machinery (R. 90). The ALJ further limited the hypothetical to work that was simple, routine, and repetitive and that had only occasional

---

[9]Ms. Decker testified that she saw a therapist named Julie McLean as part of her treatment at the Joliet Pain Clinic, but the record does not contain any documentation from a therapist by that name.

interaction with supervisors or co-workers and no interaction with the public, and also that involved only occasional decision-making or workplace changes (R. *Id*). The VE testified that given these restrictions, Ms. Decker could work in various positions defined as "light assemblers, unskilled," and "light, unskilled inspectors, checkers or weighers" (R. 90-91). If the individual could work only at the sedentary level, the VE testified that available positions included "sedentary bench assemblers", "sedentary packers", and "sedentary inspectors" (*Id.*). All such positions would require frequent or continuous handling or fingering, meaning that a person who frequently dropped things would not be able to perform these jobs (R. 92). When questioned by the claimant's attorney, the VE opined that, based on his observation of the claimant at the hearing, he did not think she would be able to stay on task at a satisfactory rate or that she would be able to focus enough to hold a job (R. 93-94).

## C.

On June 3, 2011, the ALJ issued a 17-page written decision finding Ms. Decker not disabled and denying her benefits (R. 30-47). In evaluating Ms. Decker's claim, the ALJ first acknowledged the three issues that the Appeals Council required he review; he then analyzed Ms. Decker's claims using the traditional five-step sequential evaluation process for determining disability. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a). The process requires the ALJ to consider: (1) whether the claimant has engaged in any "substantial gainful activity" since the alleged disability onset date; (2) if her impairment or combination of impairments is severe; (3) whether her impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) whether her residual functional capacity ("RFC") prevents her from performing past relevant work; and (5) if her RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4), (b)-(f); 416.920(a). The

claimant bears the burden of proof at Steps 1 through 4; the burden then shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

After finding that Ms. Decker had not engaged in any substantial gainful employment during her claims period, at Step 2, the ALJ found that Ms. Decker had the following severe impairments: sleep apnea, fibromyalgia, myofascial pain syndrome with neck and back pain complaints, dysthymia, and history of temporomandibular joint pain (R. 33). With respect to Ms. Decker's additional impairments of carpal and tarsal tunnel syndrome, the ALJ determined they were not severe because medication controlled her mild tarsal pain and the record showed that her carpal tunnel problems were almost completely resolved following surgery (*Id.*).[10]

At Step Three, the ALJ determined that none of Ms. Decker's impairments met or medically equaled any Listing impairment.[11] In reaching this conclusion, the ALJ applied the special technique[12] used to evaluate mental impairments by considering the so-called "Paragraph B" and "Paragraph C" criteria in the Social Security Administration's listings of mental impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically the listings in §§ 12.04 (affective disorders) and 12.07 (Somatoform disorders).[13]

---

[10] Although Ms. Decker told Dr. Kale that her carpal tunnel surgery did not work and she testified at the hearing that she dropped things, the ALJ discounted these statements in light of the much more significant medical evidence to the contrary and his concerns about Ms. Decker's credibility.

[11] The ALJ noted that Ms. Decker did not meet the Listing criteria for any of her physical impairments including 1.02 – Musculoskeletal System, Major Dysfunction of a Joint and 3.10 – Respiratory System – Sleep Related Breathing Disorders. The plaintiff does not argue that she does in fact meet the criteria of any Listing.

[12] To meet the Listing for a mental impairment under Paragraph B, a claimant must have at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each for extended duration. Under Paragraph C, there must be evidence of episodes of decompensation for extended duration and evidence that even a minimal increase in mental demands or change in the environment could cause the individual to decompensate. http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm#12_07 (visited on October 31, 2014).

[13] A Somatoform disorder is one where there are physical symptoms for which there are not demonstrable physical source. Such disorders are characterized by a history of multiple symptoms of several years duration beginning before age 30 that cause an individual to need to take various medications, visit the doctor frequently and

Under Paragraph B of the regulations, the ALJ determined that Ms. Decker had mild (but not greater) restrictions in her activities of daily living because over the course of her claims period: (1) she took care of her mother-in-law in 2005, (2) she cared for her three children and helped them with homework, (3) she frequently visited the doctor and admitted her ability to drive to the doctor, (4) her husband reported on a previous activities of daily living report that she talked on the telephone for four-to-five hours per day in 2006, (5) her husband wrote on the same activities of daily living report that she shopped in stores and on the computer, and (6) she watched television (R. 33-34). The ALJ also stated that he gave "great weight" to the State agency physicians and Dr. Stempniak[14] on the question of Ms. Decker's activities of daily living, which concurred with the ALJ's own Paragraph B analysis (Id.).

Again giving great weight to the State agency doctors, the ALJ next found that Ms. Decker had moderate limitations in social functioning, based on her testimony that she does not like to leave the house and her diagnosis of panic disorder with agoraphobia in crowded places (R. 34). The ALJ also relied on the fact that Ms. Decker talked on the telephone for four-to-five hours per day in 2006 and testified that she had talked regularly to her neighbor before she moved away as evidence that her social restrictions were moderate but not more severe (Id.).

The ALJ found that Ms. Decker also had moderate difficulty with concentration, persistence or pace as evidenced by her own testimony that she has concentration problems and the fact that agency physician Dr. Langutt in 2006 and Dr. Stempniak in 2007 noted that she was distracted during her consultative examinations (R. 34). In addition, the ALJ pointed out that Dr. Stempniak opined that Ms. Decker could handle simple tasks but showed difficulties

alter life patterns significantly. http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm#12_07 (visited on October 31, 2014).

[14] The State agency doctors that opined on Ms. Decker's activities of daily living as they pertained to her mental health were Dr. Langutt and Dr. Boyoga.

concentrating as items became more complex (*Id.*). Finally, the ALJ noted that there was no evidence that Ms. Decker had ever had a period of decompensation (*Id.*).

After deciding that Ms. Decker did not meet any Listing, the ALJ assessed Ms. Decker as having the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that he limited her to simple, routine and repetitive tasks (R. 35). The RFC also limited Ms. Decker to jobs involving only occasional decision making and workplace changes, no work with the public and only occasional interaction with coworkers and supervisors. She was not to work near hazards, unprotected heights or moving machinery and could only occasionally climb, balance, stoop, kneel or crouch (*Id.*).

In determining Ms. Decker's RFC, the ALJ made specific references to evidence in support of his assessed limitations. The ALJ first stated that he considered the medical evidence and Ms. Decker's testimony with respect to her symptoms and determined that her impairments could reasonably be expected to cause her symptoms and pain (R.36). However, the ALJ found Ms. Decker to be only partially credible with respect to her allegations at the hearing that her pain and symptoms were totally limiting (*Id.*). In finding Ms. Decker only partially credible, the ALJ reviewed her extensive medical history, including her treatment record and her previous medical tests, and found that the medical evidence did not support her complaints of constant, disabling pain (R. 37).

Specifically, the ALJ reviewed Ms. Decker's extensive history of treatment for various types of pain and other symptoms (the majority of which occurred between 2004 and 2006) (R. 36). He mentioned Ms. Decker's few pre-2004 medical appointments and tests, including reports of backaches in 2001 and 2003 which were helped with medication and an x-ray of her lumbar spine which revealed only minor scoliosis and degenerative changes (*Id*). The ALJ next noted

that Dr. Ahmed found her significant for diffuse trigger points in parts of her back and left knee in August 2004 but that a bone scan and MRI taken in September 2004 were both negative (R. 37).

The ALJ spent several paragraphs discussing Ms. Decker's 2005 medical history including treatment and tests for her allegations of pain in her face and cervical and lumbar spine, jaw spasms and difficulty opening her jaw, and pain in her limbs (R. 37). He noted that she did present with more than 11 out of 18 tenderness points for a diagnosis of fibromyalgia in 2005 although an EMG nerve conduction study did not reveal any abnormalities (*Id.*). The ALJ also noted that Dr. Kelly suspected bilateral carpal tunnel and tarsal tunnel syndrome, mild L5 radiculopathy, possibly cervical radiculopathy and fibromyalgia secondary to sleep deprivation (*Id.*).

In continuing his evaluation of Ms. Decker's condition in 2005 and 2006, the ALJ next noted that a sleep study revealed severe sleep apnea, which was dramatically resolved with the introduction of a CPAP machine (R. 38). He also discussed her ongoing physical therapy, which showed progression in improving her range of motion and reducing her pain but that an EMG from February 2006 revealed chronic, bilateral, severe, underlying C5-6 radiculopathy with radiation down to her elbows and wrists (*Id.*). After epidural steroid injections improved her neck pain but not pain in her left shoulder, the ALJ noted that Dr. Kelly opined that Ms. Decker may have a separate rotator cuff injury (*Id.*).[15]

The ALJ next discussed Ms. Decker's various surgical procedures and other treatment in 2006, including carpal tunnel releases on both wrists, improved sleep with a new CPAP machine, substantial pain control with a combination of Topamax, Valium and a Duragesic pain patch, and

---

[15] Moreover, the ALJ noted that a July 2007 examination by Dr. Abusharif found that Ms. Decker's diagnosis of fibromyalgia was unconfirmed (*Id.* at 40)

finally, surgery for her TMJ (R. 39). The ALJ noted that as a result of her treatment in 2006, by 2007 Ms. Decker's physical difficulties with her hands and jaw were greatly reduced, medications controlled her neck and back pain, her headaches had dissipated as her other symptoms eased, and she had successfully reduced her total dosage of pain medication without an increase in symptoms (R. 39-40). Additionally, a July 2007 exam by Dr. Abusharif found that Ms. Decker's lumbar spine had a full range of motion and that her left shoulder pain was related to a rotator cuff injury and not problems with her cervical spine (R. 40). The ALJ additionally mentioned Ms. Decker's generally normal 2008 neurological evaluation and noted that in June 2010, she exhibited normal range of motion of her extremities upon visiting the emergency room of a local hospital for breathing problems (R. 41, 1052).

The ALJ found Ms. Decker's complaint of continued jaw pain to be not credible because all her dental work had been completed satisfactorily in 2007, she reported doing "wonderfully" after that, and there was little record support for her allegations that her jaw continued to hurt after her surgery (R. 43). The ALJ considered whether Ms. Decker's allegations of extreme pain may result from either a somatoform disorder or her myofascial pain syndrome and then discounted both, noting that she did not consistently exhibit extreme pain behavior (R. 43). Instead, Ms. Decker tended to present with extreme pain at her consultative examinations and at the hearing, but did not present in such an extreme fashion at other examinations and instead reported that her pain symptoms were generally well-controlled (*Id.*).

In addition to relying on the medical evidence to support his determination that Ms. Decker's testimony was only partially credible and that she could perform work at her RFC level, the ALJ again reviewed the evidence of Ms. Decker's daily activities during various parts of her claim period and found that she was able to perform daily activities that belied her claims

of disability (R. 41). Specifically, the ALJ found that during the 2004-2007 time period, she was also engaging in various physical activities that contradicted her complaints that she was totally disabled and also called into question her credibility in general. For example, during this time period, Ms. Decker drove herself to the doctor regularly, cared for her mother-in-law, took care of her children and got them off to school, and spoke for hours on the phone with her husband despite testifying that it hurt too much to talk (R. 41-42).

The ALJ also assessed the various medical opinions in the record and considered the extent to which they supported Ms. Decker's symptoms and her RFC. The ALJ gave great weight to the opinion of the psychiatric examiner, Dr. Stempniak because his examination was consistent with the evidence of Ms. Decker's mental health functioning and because Dr. Stempniak is a mental health professional who gave Ms. Decker a full examination (R. 44).[16] The ALJ discounted Dr. Kale's physical assessment that Ms. Decker was almost totally unable to work because Dr. Kale based this assessment solely on Ms. Decker's subjective complaints of pain and refusal to move (and not, presumably, on an objective and reliable medical examination); the ALJ specifically noted that Dr. Kale found that Ms. Decker's limitations were exaggerated and that when not observed, she could move her lumbar spine 70/90 degrees and had normal range of motion in her knees, ankles and hips (R. 40). While the ALJ relied on Dr. Kale's assessment that Ms. Decker was exaggerating her pain and limitations to support his credibility determination, he gave little weight to Dr. Kale's opinion that Ms. Decker's issues were primarily psychological because his expertise was rheumatology, not mental health (*Id.*).

---

[16] The ALJ noted that Ms. Decker had received minimal mental health treatment but consultative examinations in 2007 suggested that Ms. Decker had significant mental health problems, which he accounted for in his RFC (R. 44).

Finally, the ALJ gave great weight to State agency examiner, Henry Bernet, who found Ms. Decker to have no limitations at all in January 2006 (when Ms. Decker had refused to undergo a consultative examination). But, the ALJ determined that reviewing the evidence in the light most favorable to Ms. Decker, required him to set her RFC at light work because of her pain allegations, particularly with respect to her treatment for cervical and lumbar radiculopathy (R. 45).[17]

After summarizing his assessment of Ms. Decker's credibility, the ALJ concluded that his RFC was supported by the medical findings and other evidence. He noted specifically that he accommodated Ms. Decker's mental health limitations by limiting her light work to simple, routine tasks and to jobs that do not require public contact or much decision-making (R. 45). He gave great weight to the VE's testimony that even if Ms. Decker were limited to sedentary, as opposed to light, work, there were jobs in the economy she was able to perform (R. 46).

In making his RFC determination, the ALJ rejected Ms. Decker's testimony that she frequently dropped things and that she needed to sit or stand every five-ten minutes throughout the day because those contentions were not supported by the bulk of the medical evidence (R. 46). And while he agreed with the VE that, based on Ms. Decker's presentation at the hearing it would be difficult for her to maintain any job at all, the ALJ gave little weight to this opinion because it was outside the scope of the VE's expertise (Id.). Further, the ALJ noted that while Ms. Decker displayed "odd behavior" at the hearing he did not find Ms. Decker's presentation at

---

[17] The ALJ also gave limited weight to the opinion of a chiropractor Ms. Decker saw as part of her treatment at the Joliet Pain Center because a chiropractor is not an acceptable medical source entitled to controlling weight (R. 44). The ALJ noted that the chiropractor's April 2006 opinion was internally inconsistent and also ascribed most of Ms. Decker's problems to her carpal tunnel syndrome, for which she underwent surgical release surgery in May of that year, and lumbar problems which were subsequently controlled with pain medications (Id.).

the hearing to be credible because it was not consistently documented throughout the record (*Id.,* R. 42).[18]

### III.

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

In this case, Ms. Decker argues for reversal or remand for three reasons: (1) the RFC does not fully take into account Ms. Decker's medical problems, specifically her carpal tunnel pain (Pl.'s Mem. At 6-7), (2) the ALJ failed to consider the severity of Ms. Decker's pain and how it interferes with her ability to work and failed to credit the VE's opinion that Ms. Decker could not work (*Id.* at 7-8), and (3) the ALJ erred in determining Ms. Decker's credibility regarding her testimony about her ability to work, primarily by discounting her record of psychiatric issues (*Id.* at 8-10). All three of these arguments generally boil down to the contention that Ms. Decker disagrees with the ALJ's determination that she is not as limited as she alleges and that he did not correctly consider evidence of her pain and other symptoms. Ms. Decker also argues in her reply that, at the least, the ALJ should have found her disabled between her onset date of 2000

---

[18] There is no mention of such "odd behavior" in the hearing transcript; the ALJ's opinion merely says that Ms. Decker exhibited "odd behavior" and "held her hands in an odd manner (R. 42).

and Dr. Kelly's January 2007 assessment that most of her physical problems were resolved. (Pl. Reply at 1). For the reasons we set forth below, while we agree with the ALJ's assessment that Ms. Decker is not currently disabled, we remand this case for the limited consideration of whether Ms. Decker was disabled at any time during the closed period between her onset date and the time when the majority of her impairments were resolved or controlled by surgery and/or medication.

**A.**

We first dispense with Ms. Decker's arguments in her initial brief because we find that the ALJ did, in fact, provide logical and substantiated reasons for his decision that Ms. Decker's impairments do not prevent her from performing work at the light or sedentary level as described in his RFC. Specifically, the ALJ relied on record evidence of: (1) numerous medical tests that showed only mild physical abnormalities, (2) Ms. Decker's participation in various household activities, (3) medical records from Ms. Decker's treating doctors, (4) medical opinions from State agency consultative examiners, (5) documentation that several surgical procedures had greatly reduced or eliminated Ms. Decker's hand, foot and jaw pain, (6) evidence of the success of her CPAP treatment for controlling her sleep apnea, and (7) a record of a targeted regimen of medications that had been reduced as Ms. Decker's back and neck pain improved.

The ALJ noted that all of these factors together supported a finding that despite her impairments and complaints of pain, Ms. Decker was still able to perform light work with the limitations he noted in her RFC and that as of 2007 or 2008, the majority of Ms. Decker's physical impairments showed marked and lasting improvement. Further, at Ms. Decker's limited follow-up appointments in 2009 and 2010, she did not report additional pain or other physical issues. We find that the ALJ's extensive recitation and consideration of Ms. Decker's medical

history belies Ms. Decker's allegation that the ALJ failed to consider the severity of her pain or limitations. *See, Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013) (ALJ's lengthy recitation of medical evidence and testimony was an "adequate discussion" of the issues, *quoting Schmidt v. Barnhart*, 395, F.3d 737, 744 (7th Cir. 2005)).

With respect to Ms. Decker's carpal tunnel pain, we find that the ALJ more than adequately supported his reasoning for finding that post-2006, Ms. Decker's problems with her hands were almost completely alleviated. He pointed to her follow-up examinations after her surgical releases where she reported almost complete relief from her symptoms and the absence of any discussion about carpal tunnel issues in the record after 2006 to support his decision that her carpal tunnel syndrome was not a severe impairment at the time of his decision. Ms. Decker points to no evidence to the contrary. To the extent that Ms. Decker's carpal tunnel issues could be characterized as a severe impairment prior to her release surgeries, we direct the ALJ to include consideration of this issue during remand.

Likewise, the ALJ's determination that Ms. Decker was not entirely credible was supported by substantial evidence. The credibility of a claimant must be considered in light of "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96–7p. An ALJ's credibility determination is entitled to special deference because he or she is in the unique position to observe the claimant in person. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir.2013). Thus, the Court will not overturn an ALJ's credibility determination unless it is patently wrong. *Id.* That said, if an ALJ discounts a claimant's testimony, he or she must give specific reasons for doing so and those

reasons must be supported by the evidence. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir.2003).

In this case, the ALJ first listed the substantial medical and other evidence that demonstrated Ms. Decker was able to perform a number of tasks and that she was not as physically limited as she contended. He also pointed out that the majority of Ms. Decker's pain and problems greatly improved after 2006. In addition, evidence in the record suggested that Ms. Decker had a habit of exaggerating her physical impairments and pain to State agency physicians, which the ALJ found cast doubt on her testimony and presentation at the hearing. The ALJ's ability to observe Ms. Decker at the hearing added to his overall assessment of credibility, and we find that he relied on more than sufficient evidence to support his finding that Ms. Decker's testimony, including her odd behavior at the hearing, was not a credible indication of her ability to work at the level of her RFC. *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1980) ("[a]n ALJ does not commit an impropriety when he relies on his own observations during a hearing concerning the severity of a claimant's claim. Such observations are credibility determinations and entitled to considerable weight").

We have considered – but reject – Ms. Decker's argument that the ALJ erred in discounting the opinion of the VE at the hearing that based on his observation of her at the hearing, Ms. Decker would not be able to hold a job. It is the role of the ALJ, not the VE (or anyone else), to make credibility determinations about the claimant "because the ALJ is in the best position to determine a witnesses truthfulness and forthrightness." *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). Further, where a VE's testimony is based on the false assumption that a claimant is credible, the ALJ may discount that testimony. *Trepanier v. Sullivan*, No. 88 C 327, 1989 WL 280260 *7 (E.D. Wisc. October 31, 1989).

The VE has an important role to play in the hearing process, but plaintiff has offered no authority for the proposition that the role includes assessing a claimant's credibility. Nor is there any evidence that the VE has special insight into assessing credibility that would make his opinion on that score a meaningful one – unlike, for example, doctors who must assess the genuineness of a patient's complaints in order to determine an accurate diagnosis and course of treatment. The ALJ's decision to discount the VE's opinion about the credibility of Ms. Decker's testimony and behavior at the hearing was not an abuse of discretion.

**B.**

While we find that the ALJ's opinion does more than a credible job reviewing Ms. Decker's expansive medical history and discussing how the entire record supports his opinion that Ms. Decker's impairments do not currently render her disabled, we find one issue that requires remand: whether Ms. Decker may have been temporarily disabled at any point after her alleged onset date. The ALJ found that Ms. Decker suffered a variety of severe impairments: sleep apnea, fibromyalgia, myofascial pain syndrome with neck and back pain complaints, dysthymia and a history of TMJ pain. He determined that her tarsal tunnel syndrome was not severe because her pain was controlled by medication, and her carpal tunnel syndrome had been completely resolved by a surgery in May and June 2006. In later determining the RFC, the ALJ placed weight on the successful carpal tunnel surgery; a surgery later in 2006 to address Ms. Decker's TMJ condition; and the medical reports that by the first quarter of 2007, Ms. Decker's sleep problems had diminished with the use of a CPAP machine and prescription pain medication and patches controlled her neck and back pain.

This analysis, along with the other points discussed by the ALJ that we have summarized above, provided substantial evidence for a determination that Ms. Decker was not disabled at

least as of the beginning of 2007. But, what is missing from the ALJ's discussion is whether those impairments, many of them severe, combined with other aspects of Ms. Decker's condition to render her disabled for any time period prior to 2007. The ALJ found that sleep apnea, TMJ and neck and back pain all were severe impairments that were not resolved until surgery or other treatment in late 2006; he found that carpal tunnel was not a severe impairment because it was resolved by a surgery in the Spring of 2006. These findings suggest that Ms. Decker's condition had materially improved as of 2007, and that made it necessary for the ALJ to consider whether those conditions rendered Ms. Decker disabled for any period prior to 2007. If the ALJ found that they did not, he was obligated to draw a logical bridge between the evidence and his conclusion that severe impairments were not disabling prior to their being resolved or controlled with treatment. The ALJ did not do so here.

As a result, we will remand for the ALJ to determine whether Ms. Decker was disabled at any time after her alleged onset date and prior to 2007, and to properly explain the basis for the conclusion that he reaches. In so doing, the ALJ should take care in determining Ms. Decker's alleged onset date. The ALJ stated that Ms. Decker claimed an onset date of June 1, 2000 (R. 30). Likewise, in their filings in this Court, the parties treat the onset date as June 2000 (Pl.'s Mem. at 1; Def.'s Mem. at 1; Pl.'s Reply at 1). However, all of this ignores the colloquy that occurred during the 2007 hearing between the prior ALJ and Ms. Decker's counsel (who at the time was an associate of the attorney now representing Ms. Decker in this Court): during that hearing, Ms. Decker amended her onset date to April 2003 (R. 143). We do not see any record evidence that Ms. Decker withdrew that amendment and reverted to the onset date of June 1, 2000 that she originally claimed. Nor are we aware of any basis for Ms. Decker now to retract

that amendment.  That said, we will leave that question for further consideration and determination by the ALJ.[19]

## CONCLUSION

We find that the ALJ succeeded in supporting his determination that Ms. Decker was not currently disabled but that open questions remain about the correct alleged onset date and whether Ms. Decker experienced a closed period of disability at some point after such date. For this reason, we affirm Ms. Decker's motion for reversal or remand (doc. # 14) on these limited issues and deny the motion of the Commissioner (doc. # 26).


ENTER:


**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**


**DATED:  November 18, 2014**

---

[19] We note that in his opinion, the ALJ fairly addressed the three issues raised by the Appeals Council in its decision to remand  We see no need to discuss that matter further, as our decision does not turn on whether the ALJ did so.  That is to say, our mandate on review is to determine whether there was substantial evidence for the ALJ's decision.  If so, then some defect in the ALJ's response to the three issues raised by the Appeals Council would not require a remand; conversely, as this opinion makes clear, adequately addressing the issues raised by the Appeals Council will not automatically insulate an ALJ's opinion from remand.